**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DORIS A. MARLIN,

　　　　　*Plaintiff*,

　　v.

DANIEL P. DRISCOLL, *Secretary of the Army*,

　　　　　*Defendant*.

Civil Action No. 1:21-cv-00989 (CJN)

**MEMORANDUM OPINION**

Plaintiff Doris A. Marlin worked for the federal government from 1984 until what she calls her "unwilling retirement" from the United States Army Corps of Engineers in 2019. She claims here that unlawful disability discrimination, a hostile work environment, and retaliation led to her involuntary separation. Following discovery, the Government has moved for summary judgment. For the reasons given below, the Court grants the motion.

## I.    Background

Marlin began her career with the federal government in 1984.[1] In 2010, she was hired as a Program Manager with the U.S. Army Corps of Engineers. Her job title at that time was Program Manager, GS-0340-14, Directorate of Civil Works, Civil Works Program Integration Division, Programs and Project Management Community of Practice. Along with Marlin, the other employees in the Community of Practice were Andrea Bias-Streat and Cliff Kidd. From

---

[1] *See* ECF No. 38-2 at 1 (Defendant's Statement of Material Facts Not in Genuine Dispute). The Court draws from the uncontested portions of ECF No. 38-2 for its summary of the factual background unless noted otherwise. *Compare with* ECF No. 43-1 (Plaintiff's Statement of Genuine Issues of Material Fact).

approximately May 23, 2010, to August 19, 2017, Bias-Streat was the Deputy of Civil Works
Program Integration Division and served as Marlin's "Team Leader."

### A.    Timeliness Issues and Reasonable Accommodations

Much of this case turns on the relationship between Marlin and Bias-Streat, which appears
to have soured early on over concerns about Marlin's punctuality.    A few interactions are
representative:

- On April 1, 2011, Bias-Streat emailed Marlin at 8:11 a.m. asking if she was in the office.
  Marlin responded that she had to take leave and would be in at 11:30 a.m.  Bias-Streat
  requested that Marlin amend her timesheet and submit a leave slip, and Marlin agreed.

- On April 21, 2011, Bias-Streat emailed Marlin again at 8:39 a.m. with the subject line "Are
  you in the office yet?"  Marlin responded at 10:20 a.m. with "Arriving soon."  Marlin's
  timesheet that week reflected that she arrived at 8:00 a.m. on April 21.

- On October 11, 2011, Marlin emailed Bias-Streat at 7:41 a.m. with the subject line
  "Running behind" and the body "Ill [sic] be there about 1030."

- On January 12, 2012, Marlin emailed Bias-Streat at 10:10 a.m. saying, "I need to take
  [leave] today and will be back tomorrow."

Bias-Streat raised the issue of Marlin's tardiness in an October 2012 meeting with Marlin
and Mark Mazzanti, a manager in the Program Integration Division.  Marlin responded to Bias-
Streat's concerns by saying that she had a medical condition; Bias-Streat then replied that Marlin
should request a special accommodation and get a doctor to document her condition.  Marlin
provided a doctor's note stating that she suffered from arthritis and would benefit from some
"flexibility with work schedule."

2

Problems persisted over the next several years.  On March 5, 2013, Bias-Streat forwarded Marlin an email from Mazzanti regarding a time and attendance audit, warning Marlin that "this was discussed in detail" at a recent meeting and that "[a]gencies are under a microscope."  Bias-Streat also advised Marlin to "please be careful."  In May 2015, turnstile data showed that Marlin arrived after 8:00 a.m. at the Army Corps office for seven consecutive workdays, arriving as late as 11:52 a.m. on one day.  Bias-Streat emailed Marlin on November 2, 2015, telling her that they needed to discuss concerns about the accuracy of Marlin's timesheets.  In June 2016, Marlin emailed Bias-Streat that due to a bus problem she would be about one hour late; when Bias-Streat left the office at 11:00 a.m. that day, Marlin had still not arrived.  Around that same time, Marlin contacted various colleagues about clarifying Bias-Streat's role in the supervisory chain, asking if Bias-Streat could be designated solely as Marlin's "Team Leader," without the "supervisory" "oversight" that she had "unofficially exercised since 2010."  ECF No. 39-4 (Ex. 4) at 22.

Meanwhile, Marlin developed fibromyalgia, a hypothyroid and auto-immune condition.  In April 2016, Marlin's doctor wrote a letter stating that Marlin "would benefit from an ergonomic work space evaluation and may need a flexible work schedule to accommodate this."  Marlin sought an accommodation through the Army Corps' Equal Employment and Opportunity (EEO) office on September 8, 2016.  Marlin requested, among other things, flexibility in arrival time, additional telework days per week, sick leave during symptom flare-ups, and split workdays where she would work part of the day from home and part of the day in the office.  Marlin's request was granted around October 2016, subject to periodic reassessments.

## B.     Administrative Grievances

On September 14, 2016, Marlin filed an informal administrative grievance raising five general issues unrelated to her disability.[2]  Director of Civil Works James Dalton responded on October 4, stating his belief that the issues raised in the informal grievance would be "mostly resolved by identifying the proper chain of command for Ms. Marlin."  Marlin replied on October 13, largely accepting Dalton's recommendations.  One week later, Dalton executed the "Final Decision to Informal Grievance Memorandum for Record," resolving Marlin's grievance by stating, among other things, that Marlin would receive a new supervisor for fiscal year 2016.  Dalton also indicated that he intended to follow through on the remedies he proposed in his October 4 grievance report.[3]  Nevertheless, on November 3, 2016, Marlin filed a formal grievance alleging that at least some of her complaints remained unresolved following the informal grievance process.[4]  That grievance was resolved on February 3, 2017, when the Army Corps formally closed the matter.  The decision directed no additional action other than continued senior leadership

---

[2] Marlin alleged that Bias-Streat: (A) was acting outside her role and had potentially recorded a telephone call between Bias-Streat and Marlin; (B) reacted disproportionately to Marlin requesting a restructuring of the Civil Works Program Integration Division unit; (C) had since December 2012 been overly focused on finding fault with Marlin to the detriment of overall productivity; (D) had "ero[ded] trust and repeated[ly] invalidated" Marlin, affecting Marlin's relationships with other colleagues; and (E) had made threatening statements toward Marlin.  *See* ECF No. 39-1 (Inv. File) at 15–21.

[3] The proposed remedies included a training session with Civil Works managers to "remind all of the difference between roles and responsibilities of supervisors and team leaders," a request to Bias-Streat that she provide data about Marlin's tardiness record, and a "mediated session" with Marlin and Bias-Streat.  Inv. File 38–40.

[4] Marlin alleged that (A) she was left off certain emails related to restructuring the Directorate of Civil Works, (B) Dalton insufficiently addressed concerns Marlin raised about the Programs and Project Management Community of Practice, and (C) Dalton had not addressed Marlin's allegations of threatening statements made by colleagues other than Bias-Streat.  Inv. File 9–14.

involvement to resolve what was considered a "simple personality conflict exacerbated by a lack of communication, trust, and respect" between Marlin and Bias-Streat.

## C.    The Term Appointment

While resolution of her formal grievance was pending, Marlin applied for a newly announced vacancy at the Huntsville Engineering Center.  The vacancy announcement stated that the "Project Director" appointment type was a "Term" position "not to exceed 13 months" which could "be extended up to a total of 4 years."  Marlin sought this new position "primarily to escape the situation created by Ms. Bias-Streat."  ECF No. 43-1 ¶ 55.  She was offered the position in June 2017, and her tentative offer reiterated the temporary nature of the job.

On June 9, 2017, Marlin emailed Jacqueline Williams, her point of contact for the new job, asking if she would have "return rights" to her current position after her "short-term position ends." Marlin sent a follow-up email on June 14 saying "[w]hat you've told me about the term position not allowing for return rights was not what I expected."  Williams responded that Marlin could speak with her "current organization" to see if they would be "willing to return [her] back to [her] current position once the term position is complete."  On June 19, Marlin met with Edward Belk, a Civil Works manager, who indicated that he was supportive of Marlin returning.  But Belk conveyed to Marlin that any decision on his part would "require investigation within HR" and that he would need to coordinate with Bias-Streat and others regarding how to backfill Marlin's position in a way that would allow for her return.  Belk tasked his deputy, Jerold Jurentkuff, with handling Marlin's request.

On June 28, 2017, Jurentkuff told Marlin that "return rights" are not available to "Term Appointees" but that Marlin "could secure return rights . . . before officially accepting the new position as a time-limited re-assignee" if Marlin took "a time-limited reassignment" and "not a term appointment."  On July 7, Marlin exchanged emails with Belk, Jurentkuff, Bias-Streat, and

Lakeeta Lucas (a Civil Works administrative staffer) regarding her term appointment.  Lucas told

Jurentkuff that Marlin "accepted a Term Appointment (up to 4 years) which does not have the

option of return rights," and Jurentkuff informed Lucas that any agreement on a release date would

be premature until Marlin was granted a "time-limited reassignment" rather than a "term

appointment."  He told Marlin to coordinate that change in characterization with the Huntsville

Engineering Center.

Around the same time, Williams emailed Marlin a document titled "Statement of

Understanding Conditions for Term Employment," which stated in part:

> The job you are accepting is a term position.  If the expiration of
> your appointment is less than four years from the date of your
> appointment, you may be extended later for a period not to exceed a
> total of four years.  There are no guarantees as to how long you may
> be employed.  The position is not permanent and may be terminated
> prior to the expiration date of your appointment.  Upon the
> expiration of your appointment you will be separated from
> employment with the Department of the Army.

ECF No. 39-1 (Inv. File) at 198.  Marlin signed the document on July 12, 2017.

On July 20, 2017, Marlin emailed Belk and Jurentkuff a signed copy of a document titled

"Placement Agreement" and thanked them for their time, effort, and willingness to provide "a little

risk reduction" for her.  Paragraph 4 of the Placement Agreement, signed by Marlin, Belk, and

Jurentkuff, stated:

> Upon Termination of this appointment, by the employee or the
> gaining activity, the employee will be returned to her former
> position in the Programs Integration Division (PID), provided it is
> vacant.  Or, with consent of both the employee and the PID Chief,
> she will be assigned to any other vacant position in the PID for
> which she qualifies.

Inv. File 197.

Marlin began her job with the Huntsville Center on August 20, 2017.  A Notification of

Personnel Action form dated that day stated that Marlin's employment status was converted to a

term position that would end no later than September 19, 2018. In the "Remarks" section, the form stated that the appointment to the new position did "not confer eligibility to be noncompetitively converted to career-conditional or career appointment." Marlin requested and received from the Huntsville Center telework and sick leave accommodations similar to those she had previously been given. Inv. File 162.

On April 13, 2018, Marlin's Huntsville team leader Porscha Porter told Marlin that Porter had spoken with the Army Corps headquarters and "received confirmation" from an employee named Mark Mugler that Marlin "ha[s] return rights back" and that the Army Corps would "begin preparations to receive [Marlin] back at the end of [Marlin's] term." ECF No. 45-15 (Ex. 50). On April 24, a Huntsville manager confirmed to Marlin that her role would be terminated effective September 19 and "personally thank[ed]" Marlin for her "honorable service to this organization, the Department of the Army, and the Nation during [her] Term appointment."

### D.    Marlin Requests Return Rights

On May 3, 2018, Marlin emailed Belk and Mugler informing them of her last day at Huntsville and asking if she should work with Mugler regarding her return to her previous post. Mugler then told Marlin that Bias-Streat was "now the acting Deputy" and that "Lakeeta [Lucas] should be engaged." Marlin emailed Bias-Streat later that day asking to set up a meeting for a "seamless transition" to her old job. Bias-Streat told Marlin that it was unlikely that all the items would be determined quickly and scheduled the meeting for mid-to-late June. Two days later, on May 16, 2018, Lucas received an email from another Army Corps employee stating that "[m]anagement was informed that Ms. Marlin will not have return rights back to [her prior]

position" and would thus "need to apply."  That message was communicated to Marlin in a telephone meeting with Belk, Lucas, and Bias-Streat in June 2018.[5]

Belk tried to help Marlin by extending Marlin's term appointment with the Huntsville Center beyond the original completion date of September 19 to afford her more time to apply for positions within the Army Corps.  He managed to secure an initial 11-day term extension of Marlin's position through September 30, which Lucas confirmed to Marlin on August 30.  Marlin then asked Belk and Lucas to try to extend her term for an additional year.  Harris initially told Marlin that a one-year extension was being processed but later informed Marlin that the one-year extension would not occur.  *See* ECF No. 43-1 ¶¶ 121–130.  Instead, Marlin's term was extended just 12 days.[6]  An employee who would have otherwise processed Marlin's one-year extension was told to "stand down" because the Huntsville team was "receiving different directions and need[ed] clarification."  ECF No. 46-22 (Ex. 92) at 2.

On September 26, 2018, Marlin emailed Belk and Lucas requesting an additional 120-day extension to allow her to continue competing for Army Corps positions while she had "current employment" status.  Dalton, the Director of Civil Works, initiated the second extension, which pushed the end of Marlin's term appointment from September 30, 2018, to January 27, 2019.  This extension placed Marlin in a position with the U.S. Army Corps of Engineers' Civilian Personnel

---

[5] The parties disagree about the exact date.  The Government states that Marlin received this message in a telephone meeting on June 27.  ECF 38-2 at 19.  Marlin states that she was told by Bias-Streat on June 13 that the "signed agreement between [Marlin] and Mr. Belk is not technically valid and was not approved by" the Army Corps.  ECF No. 43-1 at 16.

[6] Marlin asserts that a one-year extension "personal action form was actually created and submitted with a term not-to-exceed date of September 19, 2019."  ECF No. 43-1 ¶ 126.  But that form "[r]equest[ed] a one year extension of a term employee," ECF No. 46-20 (Exhibit 90), meaning it was "merely a request, and not an official personnel action."  ECF No. 51-1 at 70.  No official personnel action effectuating a one-year extension of Marlin's term position was ever issued.  *Id.*

Advisory Center.  When Marlin met with the director of that office, La Var Williams, in early October, he told her that there were no positions in the Civil Works or Military Programs divisions available.

On October 16, 2018, Lucas, La Var Williams, and two other employees met with Marlin and presented her with a new Statement of Understanding.  That document stated, in relevant part:

> I acknowledge and agree to the conditions listed concerning the acceptance of a TERM position and that this statement is to extend the initial TERM appointment for 120 days and does not confer permanent appointment.  Upon completion of the 120 days your appointment will be terminated on 27- Jan-2019.

Inv. File 196.

La Var Williams informed Marlin that the document was required to effectuate the extension of Marlin's term appointment through January 27, 2019.  Marlin contacted a human resources officer who told her that she could not start working without signing the new Statement of Understanding.  Marlin signed the document on October 22 "under protest," believing that it was being used to foreclose her asserted right to be noncompetitively reinstated.  After unsuccessfully attempting to extend her term appointment again, and consistent with the new Statement of Understanding, Marlin retired on January 27, 2019.  *See* Marlin Response 5–7.

### E.    Procedural History

On October 26, 2018, Marlin told an EEO officer that she had suffered physical disability discrimination and reprisal for a protected activity.  Inv. File 71–75.  She filed a formal discrimination complaint with the EEO office on February 5, 2019.  *Id.* at 91, 93.  Her formal complaint also checked the boxes for disability discrimination based on a physical disability and reprisal.  *Id.* at 7.  In a field inviting further explanation, Marlin wrote that on or about October 16, 2018, she "was forced to sign a Statement of Understanding or it would be considered a declination of my term extension and I would be forced to retire, even though I had signed a return agreement."

*Id.* Marlin alleged that this resulted from a long history of disability discrimination and retaliation for filing a grievance, and that this and other events created a hostile work environment. *Id.*

On February 14, 2019, the EEO office issued a letter documenting a partial acceptance and partial dismissal of Marlin's claims. *Id.* at 93–95. Specifically, the EEO office accepted Marlin's disability discrimination and hostile work environment claims but dismissed her reprisal allegation for failure to state a claim, noting that an administrative grievance did not constitute a protected activity. *Id.* The Department of Defense Investigations and Resolutions Directorate then investigated Marlin's claims from May 29 to July 27, 2019, resulting in a Report of Investigation that assembled relevant testimony and documents. *See id.* at 99–111. A Final Agency Decision based upon the evidence in the case file was issued on January 11, 2021; it concluded that Marlin was not subjected to discrimination. ECF 39-2 at 1, 14.

Marlin filed this action on April 9, 2021, and amended her Complaint on August 30, 2021. Following discovery, the Government moved for summary judgment.

## II.    Standard of Review

Summary judgment is appropriate only when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment must cite to materials in the record or must show that the materials cited by the other party "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact." Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. *Celotex Corp.*, 477 U.S. at 322. A fact is "material" if it has the potential to affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must show more than "[t]he mere existence of a scintilla of evidence

in support of" its position, *Anderson*, 477 U.S. at 252, and cannot rely on "mere allegations or denials," *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting *Anderson*, 477 U.S. at 248).

### III.    Exhaustion Requirement

At the threshold, the Government asks the Court to dismiss all of Marlin's retaliation claims and some of her discrimination and hostile work environment claims for failure to exhaust her administrative remedies. The Court finds that although some of Marlin's allegations are barred, she properly exhausted her core discrimination, hostile work environment, and retaliation claims.

### A.    Legal Framework

Congress enacted the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, "to ensure that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities," *id.* § 701(b)(3). The Act requires federal employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," 42 U.S.C. § 12112(b)(5)(A), and "prohibits retaliation against an individual for exercising her rights under the Act." *Doak v. Johnson*, 798 F.3d 1096, 1099 (D.C. Cir. 2015).[7]

Before bringing a Rehabilitation Act claim in federal court, however, a plaintiff must exhaust her administrative remedies. *Id.* An individual who believes she has been the victim of unlawful discrimination must consult with an EEO Counselor at the agency where she is employed "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." *Id.*; 29 C.F.R. § 1614.105(a)(1). If informal counseling fails to resolve the matter, the aggrieved individual may then file a complaint

---

[7] The cited statute is a provision of the Americans with Disabilities Act that is incorporated into the Rehabilitation Act. *See Doak*, 798 F.3d at 1098. The standards for determining liability under the Rehabilitation Act are generally the same as those applied under the ADA. *See* 29 U.S.C. § 794(d); *Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014).

with the agency that allegedly discriminated against her, which must "describe generally the action(s) or practice(s) that form the basis of the complaint." 29 C.F.R. § 1614.106(c). That begins the formal administrative grievance process, through which the agency investigates, considers, and decides the merits of the complaint. *Doak*, 798 F.3d at 1099–1100. "Once that process concludes or stalls, the Rehabilitation Act authorizes the filing of a lawsuit in federal court." *Id.* at 1100. To enforce the exhaustion requirement, courts parse EEO complaints "on a claim-by-claim basis" and may "hold that federal employees have exhausted challenges to some employment practices but not others." *Webster v. Del Toro*, 49 F.4th 562, 567 (D.C. Cir. 2022).[8]

### B.    Application

Marlin first raised her concerns with the EEO office on October 26, 2018, raising three issues all falling within the required forty-five-day window. Inv. File 71. Marlin challenged, first, her compelled signature on the Statement of Understanding in October 2018, which she asserts "forced her to retire, even though [she] had a signed return agreement." Inv. File 72. Second, she alleged that "[o]n or about October 4, 2018," she was informed that she would not be assigned duties in the Civil Works of Military Programs divisions. *Id.* Finally, she charged that "[o]n or about October 2, 2018," the Army Corps failed to return her to her former position, despite a placement agreement promising her return rights. *Id.* Her formal complaint alleged those actions were "the result of a long history of disability discrimination," constituted retaliation for the administrative grievances she filed in 2016 and 2018, and created a hostile work environment. *Id.*

---

[8] Contrary to the Government's position, *see* ECF No. 38 (Govt. Mot.) at 6, the Rehabilitation Act's exhaustion requirement is not jurisdictional here. The Government invokes *Spinelli v. Goss*, 446 F.3d 159 (D.C. Cir. 2006), but "'all *Spinelli* held' was that district courts lack jurisdiction over Rehabilitation Act claims where a plaintiff has failed entirely to 'file an administrative complaint or to obtain any administrative decision at all.'" *Kelly v. Raimondo*, No. 20-cv-3203, 2022 WL 14807447, at *7 (D.D.C. Oct. 26, 2022) (quoting *Doak*, 798 F.3d at 1103–04). Here, Marlin did file an administrative complaint, so the Court has jurisdiction.

Echoing the charges brought before the EEO office, Marlin's amended complaint alleges that she was not permitted to return to her prior position because of disability discrimination, *see* ECF No. 7 (AC) ¶¶ 38–39, and that the Army Corps' discriminatory conduct created a hostile work environment, *id.* ¶¶ 41–45. Her complaint also reiterates her allegation that the Army Corps' "reprisal . . . cannot be separated from disability discrimination, [Marlin's] request for a reasonable accommodation in 2016, and the hostile work environment linked to [Marlin's] disability." *Id.* ¶ 47. The Court reads that paragraph as alleging that the Army Corps' eventual "forced retirement" of Marlin was motivated at least partly by retaliatory animus.

The Government reads Marlin's complaint differently, characterizing it as alleging ten discrete "incidents of disparate treatment and/or reprisal, none of which were previously raised in her administrative complaint." ECF No. 38 (Govt. Mot.) at 7. The Government's main contention is that any argument not specifically made before the administrative tribunal cannot be litigated now, and so, for instance, Marlin's failure to complain about the "shortening of [her] term extension to an EEO office" means any such claim "is untimely and administratively unexhausted." ECF No. 51 (Govt. Reply) at 9. The Court agrees that Marlin cannot bring any claims that she did not previously press before the EEO office, such as her allegation that a promised 12-month extension was shortened to a mere 12 days. *See* Marlin Response 14. Marlin's informal EEO filing does not mention that allegation, *see* Inv. File 72, and her formal EEO filing is even sparser, *see id.* at 7.

But Marlin did exhaust much of her discrimination, hostile work environment, and retaliation claims. *See Webster*, 49 F.4th at 567 (noting courts apply exhaustion requirements "on a claim-by-claim basis, to hold that federal employees have exhausted challenges to some employment practices but not others"). Marlin's informal and formal EEO filings conveyed her

intention to challenge the Army Corps' treatment of her in October 2018 as acts of discrimination and retaliation and as emblematic of a hostile work environment, and the three counts she brings in her complaint all echo the allegations she timely made in those filings. Each of the challenged actions identified in her initial EEO filing occurred in October 2018, so Marlin has met her burden, as an "aggrieved person," of "initiat[ing] contact with a Counselor within 45 days of the date of the matter alleged to be" illegal. *Doak*, 798 F.3d at 1099 (quoting 29 C.F.R. § 1614.105(a)(1)). Further, the claims she presses here are substantively the same as those pressed before the EEO: Namely, that in October 2018 the Army Corps (1) forced her to sign a new Statement of Understanding, (2) refused to assign her additional duties, and (3) violated her placement agreement—and that those decisions were motived by discrimination and retaliation and were the culminating acts of the hostile work environment that pervaded around Marlin for years. In other words, Marlin asserts that but for her physical disability and prior administrative grievances, her return rights would have been honored or at the very least she would have been assigned additional duties rather than forced out of her job. Marlin's allegations, though sparse, thus comport "with the purpose of the exhaustion doctrine to give the agency notice of a claim and the opportunity to handle it internally." *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005) (citation omitted). So understood, Marlin's primary discrimination, retaliation, and hostile work environment claims must succeed or fail on the merits, not on exhaustion.[9]

## IV.    Disability Discrimination

Turning to the merits, Marlin's claim is that she was subjected to discrimination "based on her actual or perceived disability, and/or her record of being disabled." AC ¶ 38. But even if the

---

[9] The Court does not address a second threshold issue—the effect of the Government's late response to Marlin's first request for admissions, *compare* Marlin Response 8–9 *with* Govt. Reply 3–6—because the facts alleged there, even taken as true, do not affect the Court's analysis.

Army Corps' alleged actions constitute adverse actions, Marlin cannot show that the Army Corps' explanation for its decisions were mere pretext for discrimination.

### A.  Legal Framework

Disability discrimination claims that do not allege direct evidence of discrimination are generally analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246, 259 (D.D.C. 2017).  Under that framework, "the plaintiff bears the initial burden of demonstrating a prima facie case of discrimination," and the "burden then shifts to the employer to set forth a legitimate, non-discriminatory reason for the challenged action."  *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 6 (D.C. Cir. 2015).  To make out a prima facie case, a plaintiff must show that she has a disability, that she was qualified for her position with or without a reasonable accommodation, and that she suffered an adverse employment action because of her disability. *Webster*, 267 F. Supp. 3d at 259.

"An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (citation and internal quotation marks omitted).  An employee must "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).

"[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not . . . decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  At that point,

the relevant question is "whether [the plaintiff] produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against" the plaintiff on an impermissible basis. *Id.* at 495.[10] Evidence of pretext may include an employer's "better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

## B.    Application

The Government does not contest that Marlin suffered from a disability and that she was qualified for her position. *See* Govt. Mot. 9–32. The relevant questions are whether Marlin suffered an adverse employment action and, if so, whether a reasonable jury could find that the Army Corp's proffered explanation was mere pretext for discrimination. *Brady*, 520 F.3d at 495. The three actions that Marlin raised before the agency and thus can litigate here are (1) her "forced" signature of the October 2018 Statement of Understanding, (2) the Army Corps' refusal to assign her new duties, and (3) the Army Corps' refusal to return her to her old position. *See* Inv. File 72. Each of those allegations amounts to essentially the same claim: that Marlin was forced out of the Army Corps for discriminatory reasons. The Government responds that because Marlin was never entitled to remain employed by the Army Corps after the expiration of her term appointment, it took no adverse action by refusing to rehire or otherwise retain her. The Court assumes without deciding that Marlin satisfies the adverse action requirement because she has not pointed to

---

[10] The "simplified *McDonnell Douglas* framework" announced in *Brady* concerned a Title VII claim, but its logic applies to Rehabilitation Act suits too. *See Webster*, 267 F. Supp. 3d at 259.

sufficient evidence in the record from which a reasonable jury could find that the Army Corps discriminated against her because of her disability.

The Government's stated reason for its action is that it had no authority under the relevant regulations and guidance documents to simply (that is, noncompetitively) reinstate Marlin to her prior position. *See* Govt. Mot. 19–22; Govt. Reply 22. Marlin must therefore produce enough evidence for a reasonable jury to find that this nondiscriminatory reason was not the true reason for the adverse action but rather a cover for discrimination. *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1373 (D.C. Cir. 2020). But her theory of pretext is convoluted. Marlin's first move is to assert that she "suffered from Ms. Bias-Streat's consistent criticisms and differential treatment for years." Marlin Response 19. Marlin next asserts that she had a similarly situated colleague, Cliff Kidd, who Bias-Streat never scrutinized in the same way—because, Marlin suggests, she has a disability and Kidd does not. *See id.* Acting on that animus, Marlin claims, Bias-Streat then ensured that Marlin was not assigned additional duties or otherwise retained as an employee. *Id.* at 20. Specifically, Bias-Streat allegedly "improperly influenced" other Army Corps employees like Lucas "in order to foreclose [Marlin]'s ability to be reinstated noncompetitively." *Id.* at 24. In short, Marlin invokes the "cat's paw" theory of liability to argue that Bias-Streat, who allegedly bore Marlin discriminatory animus, used her position within the Army Corps to force Marlin's resignation.

To establish liability under the cat's paw theory, Marlin "must demonstrate that (1) a supervisor performed an act motivated by discriminatory animus; (2) the supervisor intended the act to cause an adverse employment action; and (3) that act was a proximate cause of the ultimate

employment action." *Ruppe v. Blinken*, 743 F. Supp. 3d 1, 19 n.19 (D.D.C. 2024).[11]  But Marlin offers little more than conclusory allegations to support this theory.  She repeatedly states that "the process towards reaching the decision to create the 2018 Statement of Understanding" was "not free from Ms. Bias-Streat's prejudicial influence," Marlin Response 26, but Marlin does not specify how Bias-Streat exerted that influence, support her position with record evidence, or explain why a reasonable fact finder could assume such influence was motivated by discriminatory animus rather than the "simple personality conflict" noted by the EEO investigator.  *Supra* at 4–5.  The closest Marlin gets to an explanation is her allegation that because Bias-Streat "used the phrase 'stand down' regularly in conversation," AC ¶ 28, Bias-Streat must have been behind the email from a Huntsville employee who used the same phrase when directing an Army Corps employee to hold off on processing a one-year extension for Marlin.  *See* Ex. 92 at 2; AC ¶ 28.  But Marlin's contention that the coincidence in phrasing suggests a conspiracy to discharge her is little more than "mere speculation," not the kind of "objective evidence" that Marlin must produce to demonstrate pretext.  *Stanford v. Howard Univ.*, No. 23-cv-3041, 2025 WL 3062907, at *4 (D.D.C. Nov. 3, 2025) (citation omitted; emphasis deleted).

Further, even assuming that Bias-Streat was the driving force behind Marlin's unwilling resignation, Marlin does not offer any evidence from which a reasonable jury could infer that Bias-Streat was motivated by discriminatory animus.  Marlin seems to ground her argument in Bias-Streat's supposedly "differential treatment towards similarly situated others," namely, Cliff Kidd.  Marlin Response 28.  But the only allegedly differential treatment is Bias-Streat's scrutiny of

---

[11] As Justice Scalia explained, the term "cat's paw" derives from one of Aesop's fables.  In the story, a monkey induces a cat to extract roasting chestnuts from a fire, burning its paws in the process.  The monkey then "makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011).

Marlin's "time and attendance and use of sick leave" while she "did not scrutinize Mr. Kidd in any way similar." *Id.* at 19. Even accepting that statement as true, Marlin does not show that Kidd is a "similarly situated" employee. *Walker*, 798 F.3d at 1092. The time and attendance scrutiny mainly occurred before Marlin even requested a disability accommodation. *See supra* at 2. Marlin also points to no evidence in the record indicating that Kidd routinely arrived late to work, and without such evidence there is no reason to infer that Bias-Streat's scrutiny of Marlin's timesheet was motivated by discriminatory animus rather than Marlin's persistent tardiness. *Id.* at 2–3.

Because Marlin has failed to point to evidence from which a reasonable jury could conclude that the Army Corps' decision not to retain her as an employee was pretextual, the Government is entitled to summary judgment on her disability claim.

## V.    Hostile Work Environment

Marlin also claims that the Army Corps' actions constituted a hostile work environment.[12] To prevail, Marlin must show that she was subjected to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. Hostile or harassing behavior "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

---

[12] The Court assumes without deciding that hostile work environment claims are cognizable under the Rehabilitation Act. *See Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 59 (D.D.C. 2022).

Marlin argues that she was "subjected to a hostile work environment from at least 2012 through 2019 by Ms. Bias-Streat" and that, although the "character of this hostile work environment shifted over the years . . . the motivation of Ms. Bias-Streat was consistent, to discriminate against [Marlin] on the basis of her disability." Marlin Response 36. Marlin alleges that Bias-Streat "launched a campaign of micromanagement, over-scrutiny, and actions grossly in excess of her authority which frustrated [Marlin]'s ability to perform work during the period of 2012 through 2016," and that "Bias-Streat also excluded [Marlin] from decision discussions for several years." *Id.* Marlin claims that she sought the term appointment "to escape the situation created by" Bias-Streat, and that when Marlin attempted to return to her prior position, Bias-Streat "continued her systematic hostile behavior" by working to prevent Marlin "from regaining full-time, permanent, federal employment." *Id.* at 37. Ultimately, Marlin argues, because of the hostile work environment created by Bias-Streat, Marlin was "permanently relieved of her job duties and responsibilities." *Id.*

A "plaintiff asserting a claim based on a hostile work environment faces a high hurdle," and Marlin has not met it. *Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 59 (D.D.C. 2022). (citation omitted). "[T]o sustain a hostile work environment claim," Marlin "must produce evidence that she was discriminated against because of her [disabled status]." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) (citations omitted), *aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007). Marlin does not point to any evidence suggesting that Bias-Streat's alleged conduct toward Marlin was motivated by Marlin's disability rather than a "simple personality conflict exacerbated by a lack of communication, trust, and respect" between Marlin and Bias-Streat. *See supra* at 4–5.

Further, even assuming that Bias-Streat's conduct was motivated by discriminatory animus, Marlin fails to demonstrate that a reasonable jury could conclude that Bias-Streat's conduct was "sufficiently severe or pervasive to alter the conditions of [Marlin's] employment." *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21). Most of Marlin's allegations involve quotidian workplace disputes that, until Marlin's voluntary acceptance of the term position, led to no change in the conditions of Marlin's employment. In other words, her "claims of harm are not supported by evidence of tangible workplace consequences, whether financial, physical, or professional," and her "assertion of pervasive and constant abuse is undermined by the sporadic nature of the conflicts." *Id.*

To be sure, Marlin also argues that the hostile work environment culminated in her termination from federal employment. But by alleging only sporadic hostile conduct over several years, Marlin's hostile work environment claim merely restates her discrimination argument, asserting in different words that Bias-Streat's animus forced Marlin's resignation. Marlin's hostile work environment claim is thus no more successful than her discrimination claim.

## VI.    Retaliation

Finally, Marlin claims that her employer unlawfully "retaliated against her following her 2016 filing of an administrative grievance." AC ¶ 47. Marlin argues that this retaliation took the form of (1) shortening her September 2018 term extension, (2) coercing her to sign the 2018 Statement of Understanding, and (3) terminating her employment. *See* Marlin Response 29.

To prove retaliation, a plaintiff generally must establish that "she suffered (i) a materially adverse action (ii) because . . . she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198. She must also demonstrate that "a causal link connects" the adverse action to the protected activity. *See Doak*, 798 F.3d at 1107 (quotation marks and citation omitted). An action is "materially adverse" in the retaliation context if it would have "dissuaded a reasonable

worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks and citation omitted). At the summary judgment stage, establishing a causal link requires "positive evidence beyond mere proximity." *Doak*, 798 F.3d at 1107 (quotation marks and citation omitted).

Marlin's retaliation claim fails. First, her asserted protected activity does not mention discrimination, a protected class, a disability, or any medical condition. Her initial informal grievance lists five issues with Bias-Streat's management style, but none relates to Marlin's disability. *See* Inv. File 15–22; *supra* at 4 n.2. Her formal grievance submitted later that year does not mention disability either. *See* Inv. File 229–234; *supra* at 4 n.4. So, as pleaded, Marlin's retaliation claim fails for lack of a protected activity. *See* AC ¶¶ 46–49.[13] Perhaps recognizing that problem, Marlin's summary judgment briefing argues that her complaint "explicitly detailed" that "the reprisal continued after 2016 and was related to her request for a reasonable accommodation" from her term employer. Marlin Response 30. But that request was promptly approved. *See* Inv. File 160–61. It is far from a "discrimination claim" or a threat to bring one. *Baloch*, 550 F.3d at 1198.

Second, even if Marlin engaged in a protected activity by requesting a reasonable accommodation, *see Solomon v. Vilsack*, 763 F.3d 1, 15–16 (D.C. Cir. 2014), she offers no evidence that the Army Corps' ultimate decision not to rehire her was causally linked to her disability or that the Government's proffered explanation was mere pretext for retaliation. Neither the 2016 grievances nor the successful request for a reasonable accommodation is close enough in temporal proximity to Marlin's ultimate resignation to support a causal link. Marlin requested an

---

[13] Her allegation regarding the shortening of her September 2018 term extension is also barred for lack of exhaustion. *See supra* section III.B.

accommodation in March 2018, *see* Inv. File 162, over six months before the alleged adverse actions. Temporal proximity can support "an inference of causation, but only where the two events are 'very close' in time." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007). The Court of Appeals has rejected such inferences "where the events were three months apart," *id.*, so the Court cannot accept Marlin's request to infer causation from a temporal gap twice as long. Marlin attempts to bolster her case by asserting that she has produced "other evidence, including aforesaid evidence," to establish a causal link. Marlin Response 32. But it is not clear what that "aforesaid evidence" is beyond Marlin's assertion that "but-for Ms. Bias-Streat's actions and involvement in the process of the term extension," Marlin would have "remained gainfully employed by the Federal Government." *Id.* The Court reads this as a rehash of Marlin's cat's paw argument, which fails for the reasons already elaborated. *See supra* section IV.B.

## VII.    Conclusion

For the foregoing reasons, the Government's Motion for Summary Judgment, ECF No. 38, is granted. A separate Order accompanies this Opinion.


DATE:  December 16, 2025

CARL J. NICHOLS
United States District Judge